# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **JEFF MICHAEL GAUDET and MICHELLE PAILLE GAUDET,** Plaintiffs. | **CIVIL ACTION** |
| | **CASE NO. 2:15-cv-00795** |
| **versus** | **DIV. "J" (Barbier)** |
| **GE INDUSTRIAL SERVICES, et al** Defendants. | **MAG. "5" (North)** |
| | **JURY DEMAND** |

### MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF DEFENSE EXPERTS RICHARD BARATTA AND FREDERICK M. BROOKS

Jeff Michael Gaudet and Michelle Paille Gaudet, plaintiffs, through undersigned counsel, submit the following memorandum in support of their motion *in limine* to exclude the testimony of defendants' biomechanical expert, Dr. Richard Baratta, and their engineering/design expert, Frederick M. Brooks.

### STATEMENT OF FACTS

Given the recent motions that have been filed, this Court is well aware of the underlying facts of this case; therefore, the following statement incorporates only those facts that are necessary for this analysis. Plaintiffs incorporate by reference the statement of facts given in their contemporaneously filed motions for partial summary judgment.

For purposes of this motion, defendants retained Dr. Richard Baratta as their biomechanical expert to create a pictorial simulation of Jeff Gaudet's position in relation to the switchgear cabinet when he was electrocuted.  Defendants retained Dr. Baratta sometime on March 16, 2016, two days before their expert disclosure deadline, Dr. Baratta spent approximately seven hours reviewing materials *and* preparing his report, and he submitted his

1

report mid-afternoon on March 18, 2016 (See Exhibit "A" at 30-31; Exhibit "B" at p. 1).  Dr. Baratta's report also incorporates graphics prepared by someone else in his office, some of which he was completely uninvolved in selecting or designing.  Indeed, Dr. Baratta testified that he does not even know how the animation programs works nor was he involved in deciding which animation to use (See Exhibit "A"). Given the complete lack of foundation for Dr. Baratta's opinions and a lack of any fundamental understanding for which his own report contains the conclusions that it does, this court should strike him as an expert witness and preclude him from testifying at trial under *Daubert*.

Rick Brooks, defendants engineering expert, also should be excluded under *Daubert* because he cherry-picked the information most favorable to defendants and ignored contradictory but material evidence presented through other witnesses.  An appropriate expert analysis under *Daubert* requires the expert to acknowledge the existence of contradictory evidence and address its role in the expert's analysis, but an expert who simply ignores the evidence, opting instead simply to rely on less reliable but more favorable evidence, fails the *Daubert* challenge.  As explained below, that is precisely what Rick Brooks did; therefore, he cannot survive this *Daubert* challenge.  For these reasons, and as more fully set forth below, this Court should find that the flaws in these experts' analyses are so significant that they cannot clear the *Daubert* hurdle for admissibility.  Instead, their opinions are wholly unreliable and cannot be presented to the jury.

## LAW AND ARGUMENT

### A.  The *Daubert* standard.

The district court serves as the gatekeeper for the admissibility of evidence in order to ensure that any scientific evidence being presented to the jury is both relevant and reliable.  See

*Lam v. State Farm Mut. Auto. Ins. Co.*, 946 So. 2d 133 (La. 11/29/2006), citing *Daubert v. Merrell-Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The *Daubert* analysis consists of a two-part test: first, the court must determine whether the expert testimony is based on a reliable methodology; second, the court must assess whether the testimony is relevant, which means that it must assist the trier of fact with understanding and/or deciding a fact issue. *Morris v. Liberty Mut. Ins. Co.*, 2011 U.S. Dist. LEXIS 10958 (E.D. La. 01/31/2011). "*Daubert* described this examination as a question of whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* See also *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244-5 (5th Cir. La. 2002) ("expert testimony is admissible under Daubert only if it is both relevant and reliable.")

As set forth below, Dr. Baratta's testimony should be excluded because it is not reliable under *Daubert*.  His opinions are largely based on information provided by counsel and not actual evidence in the case, and they are speculative at best because they reflect mere possibilities and not probabilities. This is not sufficiently reliable to meet the *Daubert* standard. This Court also should preclude Rick Brooks from testifying about any perceived cause of the accident because he improperly cherry-picked the testimony on which he relied. Courts in this district routinely exclude experts who engage in this kind of selective reasoning because their opinions do not take into account all of the evidence, help the trier of fact decide between two or more theories of how the accident occurred, and allowing their opinions may unfairly influence the jury because it gives credence to an unsupported theory merely by presenting it under the guise of expert testimony.  For the reasons that follow, both Dr. Baratta and Rick Brooks should be stricken as experts and precluded from testifying at trial.

**B. Dr. Baratta's opinions are neither relevant nor reliable under the *Daubert* standard.**

In order for expert testimony to be admissible at trial, it must assist the trier of fact with one or more issues materially in dispute.  See *Morris*, supra.  That is, the expert must be able to say, more probably than not, that the opinion is a reasonable approximation of some disputed fact in the case.  When the opinion is mere speculation or conjecture, and the expert concludes that several possibilities are equally likely, the district court should exclude the testimony because it does not help the jury to decipher the evidence and would only risk misleading the jury under the guise of expert testimony.  *Foradori v. Harris*, 523 F.3d 477, 509 (5th Cir. 2008).

In *Pipitone*, the Court of Appeal affirmed the district court's order excluding plaintiff's orthopedic expert because it found that, while the doctor's testimony may have been reliable because he was an expert in his field, his testimony nevertheless was properly excluded because his opinions were not relevant.  In his deposition, Dr. Millet, the expert in question, testified that the salmonella which infected Pipitone's joint was "as likely as not" to have come from Biomatrix's medication.  *Id.* at 244.  He further testified that "he had no 'scientific evidence' to support the conclusion that it was more likely than not that the infection occurred in this way." *Id.* The court concluded that "Dr. Millet's testimony on causation is not helpful to the fact-finder because of his inability to conclude that it was more likely than not that the Synvisc caused the infection in Pipitone's knee."  *Id.* at 245.  The court concluded that, "a perfectly equivocal opinion does not make any fact more or less probable and is irrelevant under the Federal Rules of Evidence."  *Id.* at 245.  As a result, Dr. Millet's testimony was properly excluded because it did not meet the relevancy prong of the *Daubert* analysis.

In this case, defendants retained Dr. Baratta, a biomedical engineer, to testify about the defense's theory as to what posture Jeff Gaudet was in when he was electrocuted.[1]  Dr. Baratta, however, only offers opinions about what "could be" possible with regard to Jeff's position when the electrical arc traveled through his body (Exhibit "B" at Fig. 6, "a posture of reaching the bottom of the cabinet *could be* consistent with the burn marks on Mr. Gaudet's clothing and on the cabinet.") (Emphasis added.)   In the narrative section of the report, Dr. Baratta concludes that "[h]is *potential* posture in reaching towards the bottom of the cabinet is more consistent with the physical evidence on his clothing and cabinet." (Emphasis added) (Exhibit "B" at 5).  Dr. Baratta also testified that he used the "possible" position depicted in Figure 6 based on instructions from counsel that were relayed to a non-expert third party and were not even discussed with Dr. Baratta prior to being included in his report:

> Q.      What did Mr. Hanna tell you about this case when you first spoke to him?
>
> A.      I don't remember the very specifics of the conversation, but I know that it revolved around the *potential postures* that Mr. Gaudet would have been in when this event occurred.
>
> Q.      Did Mr. Hanna suggest any of those potential postures?
>
> [Objections by counsel.]
>
> A.      Not specifically.  It was just a question of the different postures of him doing a number of different things, including reaching up or reaching down.
>
> \*          \*          \*
>
> Q.      One the same day as that conference, that gentleman created a new pose; is that correct?
>
> A.      Yes.
>
> Q.      What was the new pose Mr. Cuellar -- Mr. C created?

---

[1] Defendants retained Dr. Baratta on March 16, 2016, only two days before their deadline to exchange expert reports.

> A.      I'm not positive about this, but I believe it's the one on Figure 6.
>
> Q.      And was that a new or an amended figure?
>
> A.      Well, it's a new pose.
>
> Q.      And was that new pose created after your conversations with Mr. Williams and Mr. McDaniel?
>
> A.      I'm not sure, but probably so.
>
> Q.      And why was a new pose needed?
>
> A.      I don't know.  I don't recall as we sit here.
>
> *          *          *
>
> Q.      So is there any affirmative testimony supportive of the Figure 6 pose?
>
> A.      ***No, simply that he <u>may have been</u> reaching down for something.***

(Emphasis added) (Exhibit "A" at 9-10, 18-19, 21).

Not only can Dr. Baratta not say more probably than not what position Gaudet was in when he was electrocuted, but he cannot even say why *his* report contains the pose that it does in Figure 6.  In fact, Figure 6 is directly contrary to Jeff Gaudet's testimony about his position at the time of his electrocution, information that Dr. Baratta had prior to issuing his report (Exhibit "A" at 21-23).  "With respect to the *Daubert* relevancy prong, Rule 702 requires that the proposed expert testimony be relevant, 'not simply in the way all testimony must be relevant, Fed. R. Evid. 402, but also in the sense that the proposed expert's opinion would assist the trier of fact to understand or determine a fact in issue.'"  *Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs.*, 2006 U.S. Dist. LEXIS 27440 (E.D. La. 05/09/2006), quoting *Bocanegra v. Vicmar Servs. Inc.*, 320 F.3d 581, 584 (citing *Daubert*, supra).  It is inconceivable that Dr. Baratta's opinions would be helpful to a jury when he doesn't can't even say how the images in his own report came to be.

6

According to Dr. Baratta, the position ultimately included in his report was selected after someone *other than* Dr. Baratta spoke with defense counsel, and *they* decided which position to use.  Dr. Baratta was not even involved in the discussion or the process for selecting the pose:

> Q.    … How is this manipulated to sort of move around and to fit? How is that done?
>
> A.    Basically it's done graphically. The posture -- the joints themselves are moved until they're in a position that you want.
>
> Q.    With a mouse?
>
> A.    With a mouse, and/or you can always type in a number. But when you move with the mouse, then it goes into the right position.
>
> Q.    Does the other parts of the body follow? In other words, if you move a guy's hand all the way over here, well, his shoulder has to -- if it's a real person, if I'm grabbing your hand and moving your hand, your shoulder is naturally going to follow. Is the program like that?
>
> A.    I don't know. I've never done it myself. My understanding is you move one joint at a time, but I'm not positive about that. I'm not sure if the other joints get dragged. I just don't know how that works.

(Exhibit "A" at 43).  This renders Dr. Baratta's report and opinions totally unreliable.

Factors the court should consider when evaluating whether an expert's opinions are reliable include, (1) the "testability" of the scientific theory or technique; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) whether the methodology is generally accepted in the scientific community; and (5) whether there are standards controlling the technique's operation. *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347 (5th Cir. 2007), citing *Daubert* at 592-94.  Dr. Baratta's opinions do not satisfy any of these *Daubert* factors because,

- He did not use any "testable" scientific theory to select the most likely position, but instead relied on other non-expert to select a position that most favorably worked for the defense's theory, then they *dictated to him* which position to include in his report;

- This "random guessing to see what works best for the defense" method of selecting a position is not subject to any kind of peer review process;

- The potential rate of error is tremendous considering Dr. Baratta has no idea what position Gaudet was in when he was electrocuted, he relies on just one of several "possible" positions, and he was completely uninvolved in the process of deciding which position ultimately to include in the report;

- The process of having other non-experts, including counsel, dictate to an expert what his opinions will be is not a methodology accepted by any peer review committee, and is one that courts specifically exclude as unreliable; and

- No industry standard exists that would condone this kind of random selection.

In truth, defendants retained Dr. Baratta only two days before expert reports were due, he spent approximately 7 hours "skimming" discovery responses and depositions, then threw together a report based on what counsel told him to conclude.  Simply, his report is based purely on an end-goal methodology and is not focused on the analytical process necessary in order to reach a scientifically plausible conclusion that is "more probable than not" when compared to other possibilities.  Dr. Baratta does not try and exclude any other possibilities, a necessary component according to *Daubert*, but merely opted for the "whatever works best" approach which is precisely what *Daubert* is designed to exclude.  Given this kind of unreliable and unscientific process, any legitimacy by allowing the defense to put an "expert approved" label on it is both unreasonable and highly prejudicial.  This report does nothing but mislead the jury into believing there is some truth to these images when, in fact, they are merely speculation of third parties whose qualifications have not been disclosed and who have not been retained as experts in the case.

Finally, in addition to Dr. Baratta's inability to draw any clear conclusions about what position Gaudet most likely was in, the assumptions he makes are based on unreliable information that was provided by counsel.  As a result, his opinions are unreliable and will not assist the jury

with determining any issue in the case.  Dr. Baratta testified that in order to create a biped figure, he needed to know certain anatomical information about Jeff Gaudet that he first says he obtained from the medical records.  When pushed, however, he admits that he did not actually review any medical records but instead relied on a "medical chronology" provided by counsel:

> Q. What medical records – in the basis of your report, Dr. Baratta, correct me if I'm wrong, but on a quick review, the only thing that I see about Jeff's medical records is a medical chronology for Mr. Gaudet was reviewed.
>
> A. Yes.
>
> *          *          *
>
> Q. And who provided that chronology to you?
>
> A. I believe that was Mr. Hanna.

(Exhibit "A" At 42).  An expert simply cannot rely on summarized information from counsel as his sole basis for information critical to his analysis.  Dr. Baratta's report is nothing more than an amalgamation of other people's work in which he was neither directly nor peripherally involved, yet it has been presented as his "expert" opinion even though he was not actively involved in making any of the critical decisions, the most important of which is the position of Jeff Gaudet's body when he was electrocuted.  That information was supplied to him, and his job was simply to make it work.  Nothing in this process bears any semblance of reliable expert testimony that would aid the trier of fact in determining what position Jeff Gaudet was in when he was injured.  Accordingly, based on *Daubert* and *Pipitone*, Dr. Baratta must be precluded from testifying at trial.

**C.  <u>The testimony of defense electrical engineering expert, Rick Brooks, is unreliable because he relies solely on cherry-picked evidence while ignoring key evidence unfavorable to defendants.</u>**

The Daubert test is designed to strike a balance between allowing experts the freedom to formulate opinions based on their reasonable interpretation of the evidence, and indeed,

9

reasonable minds may well disagree on how that evidence should be interpreted. However, opinions based mainly on subjective beliefs or unsupported speculation are not derived from a reasonable interpretation of the evidence. Expert opinions that fall into the latter category should be excluded. See *Lassiegne v. Taco Bell Corp.*, 202 F. Supp. 2d 512, 515, 522 (E.D. La. 04/11/2002) (aim of Daubert is to exclude expert testimony based merely on subjective belief or unsupported speculation; "expert testimony is not admissible when it is based merely on subjective belief or unsupported speculation.") The purpose of the Daubert inquiry is to "make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 515, citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (U.S. 1999).

Rick Brooks, an electrical engineer who, according to his report, is an expert in the areas of electrical equipment design, refinery electrical systems, workplace safety and accident reconstruction, was hired to evaluate whether the accident was caused by a defective switchgear as opposed to other factors unrelated to defendants' design. Brooks' analysis, however, is flawed under the *Daubert* standard because he solely relied on cherry-picked information in forming his opinions. He does not evaluate evidence unfavorable to defendants' position, but instead he simply chose to ignore it. This approach is, in a word, wrong, and experts are routinely excluded when they engage in this kind of selective analysis. See *Shawler v. Ergon Asphalt & Emulsions, Inc.*, 2016 U.S. Dist. LEXIS 3321 (E.D. La. 03/15/2016) (expert who cherry-picks evidence favorable to its client properly excluded when it is clear expert is merely a "hired gun" and is more interested in results than methodology); *RSUI Indem. Co. v. Am. States Ins. Co.*, 2015 U.S. Dist. LEXIS 64552 (E.D.La. 03/18/2015) (court excluded expert who cherry-

picked facts because it was difficult to discern any meaningful methodology other than simply to justify client's conduct); *Burst v. Shell Oil Co.*, 2015 U.S. Dist. LEXIS 77751 at *28-29 (E.D. La. 06/16/2015) (expert excluded because he cherry-picked data from studies that did not otherwise support his conclusion, failed to explain contrary results, and manipulated data without providing any evidence of his work); *Konrick v. Exxon Mobil Corp.*, 2016 U.S. Dist. LEXIS 13478 at *21 (E.D. La. 02/04/2016) (expert excluded because he cherry-picked data and did not present a meaningful analysis in which he reconciles the contradicting results and explains their relevance to the facts of this case.)

In order for an expert to survive a *Daubert* challenge based on cherry-picking, he has to be able to show that he considered the unfavorable evidence and ruled it out. The court, as the gatekeeper of evidence, has to evaluate whether the expert's methodology should be the subject of "vigorous cross-examination" or excluded because it will not assist the trier of fact. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 2016 U.S. Dist. LEXIS 20974 (E.D. La. Feb. 22, 2016). However, there is a difference between vigorous cross-examination and blatant unreliability.

> The Fifth Circuit has held that, in determining the admissibility of expert testimony, district courts must accord proper deference to 'the jury's role as the proper arbiter of disputes between conflicting opinions.' As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.

*Id.* at *8, citing *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996). "Nonetheless, expert testimony 'must be reliable at

each and every step or else it is inadmissible." *Id.* "Where the expert's opinion is based on insufficient information, the analysis is unreliable." *Id.*, citing *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009).

In order to determine which category an expert's opinions fall into, the court must examine the expert's reasoning and methodology. "[F]undamentally unsupported 'opinions' offer[] no expert assistance to the jury and should be excluded." *Id.*, citing *Guile v. United States*, 422 F.3d 221, 227 (5th Cir. 2005). Here, Brooks did not even consider it – he ignored it. His testimony will not assist the jury at trial because he does not explain why his theory is correct and others are unreliable. Significantly, in CBS' responses to plaintiffs' interrogatories, CBS identified the following people as being involved in the refurbishing process:

- Sam Endres (vice-president of production)
- Johnny McClinton (switchgear department head)
- Glenn Hellinger (medium voltage department head, deceased)
- Chet Hough (draftsman and nameplates)
- Troy Yosten (quality control technician and test technician)

Bill Scofield, president of CBS, was ***not*** involved in the process at all (Exhibit "C" at Rog. 5).

Of these individuals, Sam Endres, Johnny McClinton, Chet Hough and Troy Yosten have been deposed, and all of these depositions were provided to Brooks for review (Exhibit "D" at Appx. A). When asked which depositions he "reviewed" in order to prepare his report, Brooks does not mention Chet Hough or Troy Yosten at all. In fact, their names appear nowhere in his deposition (Exhibit "E" word index). He further testified that while he did review Sam Endres and Johnny McClinton's depositions, he chose not to rely on them because their testimony was inconsistent with that given by Bill Scofield:

Q.      Of those documents that you reviewed, what are the ones that you relied upon for your opinions?

[Counsel objection.]

A.      . . . As far as Circuit Breaker Sales, primarily Mr. Schofield. I did review Endres, McClinton, and Ledbetter. But my report is based primarily upon the information that is included in Schofield's deposition.

                    *          *          *

Q.      Is there any conflicting testimony in this case in which you had to make a determination as to which testimony was more credible than others?

A.      Yes.

Q.      And what was that?

A.      . . . The testimony of other Circuit Breaker Sales representatives, including Endres, McClinton, Ledbetter, who do have testimony that conflicts with the testimony of Mr. Schofield. And maybe it conflicts and maybe it doesn't conflict. It depends on how some of the testimony is interpreted.

(Exhibit "E" at 19-20, 23-24).

The reason Brooks gives for accepting Schofield's testimony over those who were directly involved in manufacturing and designing the switchgear is because he remembered "dealing with Orion" during the purchasing and manufacturing process (Exhibit "E" at 24-25). However, Schofield testified that he was more of a "cheerleader" and was not involved in the engineering aspect of the project (See Exhibit "E" at 19-20, 23-25, 26-27, Schofield was a "cheerleader" during the inspection and as soon as the parties started discussing the engineering aspect of the project, he headed back to the main office because he did not want to "stand there for five hours while that goes down.") Brooks nevertheless elected to rely on Schofield's testimony over that of Endres, McClinton, Hough and Yosten, whose testimonies were either disregarded or not considered at all,

because Schofield's testimony was more favorable to the defendants' position.[2]  He made this decision knowing that Schofield is **not** an engineer and was **not** involved in the manufacturing process.  Brooks even acknowledges inconsistencies between the testimony of those who designed and manufactured the switchgear and Schofield, whose role was more marketing/public relations and/or customer service and **not** manufacturing or design, yet instead of addressing those inconsistencies he ignored them altogether and chose to rely on the non-engineer office person instead.  *Daubert* specifically precludes this kind of cherry-picking, and courts in this district routinely exclude experts who engage in this kind of selective analysis.

Brooks' decision to adopt Schofield's testimony over that of Endres, McClinton and others, is critical to understanding the depth of his flawed methodology and ultimate conclusions.  Brooks ignores their testimony because it supports plaintiffs' theory that a safety barrier and ground bus riser should have been inserted into the switchgear.  Specifically, both Endres and McClinton acknowledge that Orion, Valero's predecessor in interest, originally provided specifications for a metal clad main-tie-main switchgear and included a requirement that the unit meet a number of industrial standards, including the IEEE standards.  Those standards include, among other things, provisions for including a safety barrier and ground bus riser; therefore, if Brooks did not decide to completely ignore this unfavorable testimony that came from the switchgear designers themselves, he would have to acknowledge that the switchgear, as delivered, **did not** comply with industry standards (See Doc. 197-2 at *2).

---

[2] The reasons Brooks decides to adopt Schofield's recitation of the facts over those of Endres, McClinton and others who clearly were more knowledgeable of the facts pertaining to actually manufacturing and designing the switchgear, are set forth in plaintiffs' *Liability Motion for Summary Judgment* [Doc. 197-2], and they are adopted and incorporated herein by reference.

Sam Endres testified, among other things, that,

- The designer of the switchgear should have considered Orion's specifications when designing and building that switchgear;

- The standards outlined in the specifications "are requirements for the designer of the switchgear;"

- CBS' own internal procedures required CBS to bring the switchgear "to safe operating condition as recommended by the manufacturer's instructions of industrial standards…;"

- CBS had a GE switchgear that matched the specs Orion had requested; and

- The incident switchgear was a GE Power/Vac switchgear.

[See Doc. 197-2 at *2-3 for deposition cites].  Significantly, GE's switchgear design includes the very same safety features missing from the final CBS product, and its switchgears have incorporated that design since the 1970s.

Moreover, according to Endres, the equipment CBS had in storage was not a main-tie-main design *per se*, so it modified the GE unit it had in stock using surplus equipment, but this required moving the bus bars in order to make the conversion [See Doc. 197-2 at *3].  Johnny McClinton, the incident switchgear's designer, similarly testified that CBS typically puts protective barriers in its switchgears to keep a person "working on the feeder breakers … away from the main bus and behind that barrier," but that was not done in this case [See Doc. 197-2 at *3].  Had Brooks chosen not to simply ignore this testimony, he would have to figure out how to justify the fact that CBS omitted the protective barriers in the incident switchgear, and as a direct result of that omission, Jeff Gaudet, who was "working on the feeder cables" at the time of the injury, was electrocuted as a result.  Brooks violated the *Daubert* standards when he chose to ignore this clearly material testimony, and in doing so he has rendered his opinions irrelevant and unreliable.

Plaintiffs recognize and respect that *Daubert* encourages vigorous cross-examination and the presentation of contrary evidence in order to discount the weight a jury may give to a

particular expert, but when the underlying basis upon which that expert relies is so fundamentally flawed because it ignores evidence that goes to the very core of the issues presented, the court must step in and exercise its role as the gatekeeper in order to exclude an expert who's opinions are fundamentally unsupported by the evidence. Had Brooks considered and distinguished the inconsistent testimony between Schofield and Endres and McClinton, or tried to reconcile those inconsistencies through testimony from Hough or Yosten (who he ignored completely), perhaps these issues simply would be fodder for cross-examination. However, since he did not engage in this kind of analysis *at all*, but instead chose to ignore or disregard it altogether, this Court must recognize that Brooks' methodology is so flawed that it goes beyond grounds for cross-examination and becomes excludable because it is unreliable, prejudicial and cannot be presented to the jury.  Brooks chose to cherry-pick only that testimony which was most favorable to the defendants, and he must be excluded based on the *Daubert* standard.

## CONCLUSION

For the reasons stated herein, neither Dr. Baratta nor Rick Brooks meet the minimum threshold requirements under *Daubert*.  This Court, therefore, should strike them as expert witnesses and preclude them from testifying at trial.

Respectfully submitted:

JOHN RANDALL WHALEY (#25930)
3112 Valley Creek Drive, Suite D
Baton Rouge, LA 70808
Telephone: 225.302.8810
Facsimile: 225.302.8814
jrwhaley@whaleylaw.com

Pittenger Law Firm
Thomas R. Pittenger (#21819)
3112 Valley Creek Dr. Suite D
Baton Rouge, LA 70808
tommy@tommypittenger.com
Telephone: (225) 930-4901

LOEB LAW FIRM

_____
J. Scott Loeb (#25771)
Lauren F. Bartlett (#28311)
1180 West Causeway Approach
Mandeville, Louisiana  70471
Tel.:  (985) 778-0220
Fax:  (985) 246-5639
Email: sloeb@loeb-law.com
          lbartlett@loeb-law.com

*Attorneys for Jeff Michael Gaudet and*
*Michelle Paille Gaudet, plaintiffs*

## CERTIFICATE OF SERVICE

I do hereby certify that this  3rd   day of May, 2016, I electronically filed the foregoing

with the Clerk of Court by using the CM/ECF system which, if they are subscribed, will send a

notice of electronic filing to all counsel of record.  I further certify that I have also served all

counsel of record with a copy of the foregoing via email.

_____