Richard V. Baratta, Ph.D., PE

```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA
 2

      JEFF MICHAEL GAUDET and      §
 3    MICHELLE PAILLE GAUDET,      §
                                   §    CIVIL ACTION NO:
 4         Plaintiffs,             §    2:15cv00795
                                   §
 5    v.                           §    DIVISION "J" (Barbier)
                                   §
 6    GE INDUSTRIAL SERVICES       §    MAGISTRATE "5" (North)
      et al,                       §
 7                                 §
           Defendants.             §
 8

 9
10                     ORAL DEPOSITION OF
11                RICHARD V. BARATTA, PH.D., PE
12                   FRIDAY, APRIL 22, 2016
13
14
15         ORAL DEPOSITION OF RICHARD V. BARATTA,
16    PH.D., PE, produced as a witness at the instance of
17    the Plaintiffs and duly sworn, was taken in the
18    above-styled and numbered cause on the
19    above-referenced date, from 12:53 p.m. to 3:05 p.m.,
20    before Michael E. Miller, FAPR, RDR, CRR, CLR,
21    Notary Public in and for the State of Texas,
22    reported by realtime stenographic means at Gray
23    Reed & McGraw PC, 1601 Elm Street, 49th Floor,
24    Dallas, Texas, pursuant to the Federal Rules of
25    Civil Procedure.
```

EXHIBIT A

Richard V. Baratta, Ph.D., PE

```
 1      A.     I do.
 2      Q.     Do you have that with you?
 3      A.     Yes.
 4      Q.     In this professional services detail of
 5  current charges list, it was mentioned that you work
 6  with Chris Cuellar -- am I saying his last name
 7  correctly?
 8      A.     "KWAY-yar."
 9      Q.     Cuellar.  Who is he?
10      A.     He's a graphics artist.
11      Q.     He works for Rimkus?
12      A.     Yes.
13      Q.     What did Mr. Hanna tell you about this
14  case when you first spoke to him?
15      A.     I don't remember the very specifics of
16  the conversation, but I know that it revolved around
17  the potential postures that Mr. Gaudet would have
18  been in when this event occurred.
19      Q.     Did Mr. Hanna suggest any of those
20  potential postures?
21             MR. WILLIAMS:  Object to the extent
22  you're asking for attorney work product or attorney
23  privileged communications with their expert.  I
24  think to the extent you're asking him for the facts
25  or the information upon which he relied, that's
```

```
 1   discoverable.  I don't think any impressions of the
 2   person are discoverable.
 3            MR. WHALEY:  Okay.  Subject to that
 4   objection, can you answer?
 5            MR. WILLIAMS:  Well, I'm telling you
 6   not to give any information that you were given that
 7   is the mental impressions or thoughts of counsel.
 8            THE WITNESS:  Understood.
 9        A.   Not specifically.  It was just a question
10   of the different postures of him doing a number of
11   different things, including reaching up or reaching
12   down.
13   BY MR. WHALEY:
14        Q.   What assumptions did you make for
15   purposes of your report?
16        A.   The assumptions that I would have had to
17   make simply had to do with the dimensions of the
18   cabinet, which were estimates based on the
19   photographs and some of the dimensional
20   measurements, and on Mr. Gaudet's height and weight,
21   which were as given in the medical records.  And
22   those were the fundamental assumptions that were
23   made.
24        Q.   Did you make any assumptions regarding
25   the position of Mr. Gaudet's body when it came in
```

```
 1        A.    No.
 2        Q.    Did Mr. Gaudet have amnesia after the
 3   incident?
 4        A.    I understand he did.
 5        Q.    On the details of current charges,
 6   professional services, on 3/18/16, you billed
 7   2.4 hours for a teleconference with Mr. Williams and
 8   Mr. McDaniel to finalize and transmit the report; is
 9   that right?
10        A.    It may very well be.  I haven't reviewed
11   that.
12              (Document review.)
13        A.    Not teleconferences to finalize and
14   transmit report, but they're teleconferences with
15   Mr. Williams and Mr. McDaniel and finalizing and
16   transmitting the report.
17        Q.    And then on the same day, Mister -- I'm
18   going to mess his name up again.  Cuellar?
19        A.    Cuellar.
20              MR. WILLIAMS:  How do you spell that?
21              THE WITNESS:  C-U-E-L-L-A-R.
22   BY MR. WHALEY:
23        Q.    On the same day as that conference, that
24   gentleman created a new pose; is that correct?
25        A.    Yes.
```

```
 1      Q.    What was the new pose that Mr. Cuellar --
 2   Mr. C created?
 3      A.    I'm not positive about this, but I
 4   believe it's the one on Figure 6.
 5      Q.    And was that a new or an amended figure?
 6      A.    Well, it's a new pose.
 7      Q.    And was that new pose created after your
 8   conversations with Mr. Williams and Mr. McDaniel?
 9      A.    I'm not sure, but probably so.
10      Q.    And why was a new pose needed?
11      A.    I don't know.  I don't recall as we sit
12   here.
13      Q.    After you issued your report, I was
14   provided a new Figure 5.  Are you aware of that?
15      A.    Yes.
16      Q.    What changed?  I understand that there
17   might have been a typo in some of the language in
18   Figure 5.  I think maybe "cabinet" was misspelled.
19            What changed in regard to the pose or the
20   figure?
21      A.    There's no change to the pose or the
22   figure.  And, in fact, the figure that I have here
23   is the older one that said his "left knee by the
24   cabinet near the area of the mark," where it should
25   be "his left elbow by the burn -- near the area of
```

1    A.    So reaching down would be consistent with
2    picking something up.
3    Q.    Okay.  But Mr. Dinvaut said he didn't
4    know.
5    A.    Correct.
6    Q.    So is there any affirmative testimony
7    supportive of the Figure 6 pose?
8    A.    No, simply that he may have been reaching
9    down for something.
10   Q.    In fact, Dr. Baratta, there's testimony
11   specifically contrary to this pose, isn't there?
12   A.    Not that I'm aware of.
13   Q.    Did you read Jeff Gaudet's deposition?
14   A.    Yes.
15   Q.    Part of being a good expert is
16   considering all of the facts.  You'd agree with
17   that?
18   A.    Yes.
19   Q.    You'd agree that it would be kind of
20   sloppy work if you only cherry-picked certain
21   testimony on which to base your opinion.  You'd
22   agree with that, wouldn't you?
23         MR. WILLIAMS:  Object to the form.
24   A.    Yes.
25         ///

```
 1   BY MR. WHALEY:
 2        Q.    And you want to give a full and fair
 3   consideration of the facts, right?
 4        A.    Yes.
 5        Q.    And you want to give a full and fair
 6   consideration of the testimony, right?
 7        A.    Sure.
 8        Q.    You don't want to come to preconceived
 9   ends in your expert report, right?
10        A.    Correct.
11        Q.    You're aware that Mr. Gaudet was asked
12   whether or not he was trying to retrieve something
13   from the cabinet at the time of his accident?
14        A.    I don't recall that, sitting here.
15        Q.    I'm going to show you Jeff Gaudet's
16   deposition of September 11th, 2015, starting at
17   page 127, line 17, and ask you to read through
18   page 128, line 3.
19        A.    "As you sit here today, do you recall" --
20   well, this is the question:  "As you sit here today,
21   do you recall if you were trying to retrieve that
22   tool or do anything with respect to that tool, that
23   tool that we see, that set of side cutters when the
24   accident occurred?"
25              "No."
```

```
 1             Mr. Whaley:  "You don't recall, or you
 2   were not trying to retrieve that at the time of the
 3   accident?"
 4             Response:  "I wasn't trying to retrieve
 5   them, no."
 6        Q.   Would that sworn testimony cause you to
 7   believe that Figure 6 is less likely than more
 8   likely?
 9        A.   Not necessarily.
10        Q.   Why not?
11        A.   Well, two things.  As you mentioned
12   before, Mr. Gaudet did have amnesia after the
13   accident, and the only reason why that figure is
14   there is because that would be a posture that would
15   be consistent with those burn marks.  Those burn
16   marks would be consistent with that, so that's based
17   primarily on where those marks are.
18        Q.   And that figure was created after a
19   two-and-a-half-hour telephone conversation with
20   Mr. Williams and Mr. McDaniel, right?
21             MR. WILLIAMS:  Object to the form.
22        A.   No, it was in the context of that very
23   same day, not the -- the two and a half hours
24   contains my entire work for the day, not just a
25   two-and-a-half-hour teleconference.
```

```
 1   relevant to what I was trying to do.
 2        Q.   And what were you trying to do?
 3        A.   I was trying to look at the geometric
 4   relationship between the burn mark on the left, the
 5   lower bus, the two crossbars and the general area
 6   where the upper clamps would be, to the effect that
 7   I could with the information that I had, which was
 8   strictly photographs without measurements.
 9        Q.   And why wouldn't you try to create a more
10   accurate representation of what's reflected in the
11   photographs?
12        A.   Because I only needed to deal with the
13   things that he was doing and that he might be
14   interacting with, and also because I didn't have all
15   of what I would want to create a more elaborate,
16   more detailed graph, such as a scan, which is what I
17   would have wanted to do.
18        Q.   A scan.
19             And you first started working on this on
20   March 16?
21        A.   Yes.
22        Q.   And you issued a report two days later?
23        A.   Yes.
24        Q.   And you didn't rely on any of
25   Mr. Johnson's files to begin with?
```

```
 1      A.    No.
 2      Q.    The work that you did on this case,
 3   Mr. Baratta, was 2.2 hours on the 16th?
 4      A.    Yes.
 5      Q.    3.10 hours on the 17th?
 6      A.    Yes.
 7      Q.    And then 2.4 hours on the 18th --
 8      A.    Yes.
 9      Q.    -- right?
10            So you did 2.2, 3.1 and 2.4.  So that's a
11   total of 7.7 hours; is that right?
12      A.    Yes.
13      Q.    That you worked on this case?
14      A.    Yes.
15      Q.    Over the course of two days?
16      A.    Three.
17      Q.    Three days.
18            On page 6 of your report, you provide the
19   basis of the report, correct?
20      A.    Yes, sir.
21      Q.    You list out 11 depositions?
22      A.    Yes.
23      Q.    Did you read all 11 depositions?
24      A.    Not page by page.
25      Q.    Did you read any of the depositions?
```

1   from -- at some point where -- from the medical
2   chronology, I believe, and my -- what I would want
3   to do is come as close as I can to the time of the
4   accident.
5       Q.   Okay.  What medical records -- in the
6   basis of your report, Dr. Baratta, correct me if I'm
7   wrong, but on a quick review, the only thing that I
8   see about Jeff's medical records is a medical
9   chronology for Mr. Gaudet was reviewed.
10      A.   Yes.
11      Q.   Where is that medical chronology?
12      A.   It should be in the file.
13      Q.   Okay.  Can you look at it for me?
14      A.   It's not in the physical file, but it
15  should be in the file that I provided.
16      Q.   Okay.  I have not been able to download
17  that, so at a break can you get that for me?
18      A.   I should be able to.
19      Q.   And who provided that chronology to you?
20      A.   I believe that was Mr. Hanna.
21      Q.   Do you know what changes had been made to
22  the switchgear after this accident?
23      A.   No, sir.
24      Q.   After the height and weight is inputted
25  for the biped, how is the biped manipulated?  And

1   that's my word.  I don't mean that as a pejorative.
2   But how is it manipulated to sort of move around and
3   to fit?  How is that done?
4        A.    Basically it's done graphically.  The
5   posture -- the joints themselves are moved until
6   they're in a position that you want.  And let's say
7   if you're moving a hand, you're moving the arm to
8   put the hand in the right position, you may need to
9   move the trunk.  And it's basically done quite
10  literally by moving the articulations.
11       Q.    With a mouse?
12       A.    With a mouse, and/or you can always type
13  in a number.  But when you move with the mouse, then
14  it goes into the right position.
15       Q.    Does the other parts of the body follow?
16  In other words, if you move a guy's hand all the way
17  over here, well, his shoulder has to -- if it's a
18  real person, if I'm grabbing your hand and moving
19  your hand, your shoulder is naturally going to
20  follow.  Is the program like that?
21       A.    I don't know.  I've never done it myself.
22  My understanding is you move one joint at a time,
23  but I'm not positive about that.  I'm not sure if
24  the other joints get dragged.  I just don't know how
25  that works.

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

      JEFF MICHAEL GAUDET and    §
 3    MICHELLE PAILLE GAUDET,    §
                                 §   CIVIL ACTION NO:
 4         Plaintiffs,           §   2:15cv00795
                                 §
 5    v.                         §   DIVISION "J" (Barbier)
                                 §
 6    GE INDUSTRIAL SERVICES     §   MAGISTRATE "5" (North)
      et al,                     §
 7                               §
           Defendants.           §
 8

 9

10

11              REPORTER'S CERTIFICATION

12                ORAL DEPOSITION OF

13           RICHARD V. BARATTA, PH.D., PE

14               FRIDAY, APRIL 22, 2016

15

16         I, Michael E. Miller, FAPR, RDR, CRR, Notary
17   Public in and for the State of Texas, do hereby
18   certify that the facts as stated by me in the
19   caption hereto are true;
20         That there came before me the aforementioned
21   named person, who was by me duly sworn to testify
22   the truth concerning the matters in controversy in
23   this cause;
24         And that the examination was reduced to
25   writing by computer transcription under my
```

```
 1   supervision; that the deposition is a true record of
 2   the testimony given by the witness.
 3          I further certify that I am neither attorney
 4   or counsel for, nor related to or employed by, any
 5   of the parties to the action in which this
 6   deposition is taken, and further that I am not a
 7   relative or employee of any attorney or counsel
 8   employed by the parties hereto, or financially
 9   interested in the action.
10          Given under my hand and seal of office on
11   April 29, 2016.
12
13
14   _____
     MICHAEL E. MILLER,
15   Fellow of the Academy of Professional Reporters
     NCRA Registered Diplomate Reporter
16   NCRA Certified Realtime Reporter
17   Notary Public in and for
     The State of Texas
18   My Commission Expires: 7/9/2016
19
20
21
22
23
24
25
```