

**Rimkus Consulting Group, Inc.**
3850 North Causeway Boulevard, Suite 1325
Metairie, LA 70002
(888) 474-6587 Telephone
(504) 832-1060 Facsimile

# Preliminary Biomechanical Report of Findings

## BIOMECHANICAL ANALYSIS: JEFF GAUDET ELECTRICAL ACCIDENT

### Cause No: 2:15-CV-00795

Style:  Jeff Michael Gaudet/Michelle Paille Gaudet vs. Circuit Breaker Sales, LLC/GE Industrial Services

RCG File No:  52011882

Prepared For:

**MOULEDOUX, BLAND, LEGRAND & BRACKETT**
**701 POYDRAS STREET, STE. 4250**
**NEW ORLEANS, LA  70139**

Attention:

**MR. MARK HANNA**

Digitally signed
by: Richard V
Baratta
DN: CN = Richard
V Baratta C = US
O = IdenTrust
ACES Business
Representative
OU = RIMKUS
CONSULTING
GROUP  INC
Date: 2016.03.18
15:36:48 -06'00'

**Richard V. Baratta, Ph.D., P.E.**
**Engineering Number 34792**
**Senior Vice President**

STATE OF LOUISIANA
RICHARD V. BARATTA
License No. 34792
PROFESSIONAL ENGINEER

EXHIBIT
**B**

March 18, 2016

# TABLE OF CONTENTS

I.    Introduction ................................................................................. 1

II.   Conclusions ................................................................................ 2

III.  Discussion ................................................................................. 3

IV.  Basis of Report ........................................................................... 6

V.   Attachments ................................................................................ 8

    A. Photographs

    B. Figures

    C. CV

# Section I
# INTRODUCTION

On May 17, 2014, Mr. Jeff Gaudet, an electrician working at the Valero St. Charles WP Substation, sustained electrical contact injuries while working within a switchgear cabinet.

Rimkus Consulting Group, Inc. (Rimkus) was retained to address biomechanical, kinematic and anthropometric issues related to Mr. Gaudet's posture at the time of injury. This report underwent technical review by Anastasios D. Tsoumanis, Ph.D., Division Manager.

This report was prepared for the exclusive use of Mouledoux, Bland, Legrand & Brackett and was not intended for any other purpose. Our report was based on the information available to us at this time, as described in the **Basis of Report**. Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on our opinions and conclusions and to revise our opinions and conclusions if necessary and warranted.

## Section II
## CONCLUSIONS

1. Mr. Gaudet indicated that he was using a screwdriver to tighten a clamp for a grounding cable from below the bar separating the upper and lower cabinets. The two different clamps that were on the grounding cable would be best accessed from a higher position.

2. Mr. Gaudet's anatomical dimensions would make it difficult to access the area involved from below without placing most of his body within the cabinet.

3. Mr. Gaudet's anatomical dimensions are inconsistent with his body being positioned in the manner he described for the performance of the task he identified. Given the location and position of the clamp, approaching from a standing position would be more biomechanically appropriate to tighten the clamp.

4. The location of the marks on Mr. Gaudet's jacket and on the cabinet would be consistent with his left elbow being approximately one foot off the ground, which would not be compatible with his right arm reaching up into the area he indicated.

5. The location of the marks on Mr. Gaudet's jacket and on the cabinet were more consistent with a stooped position rather than reaching up into the upper cabinet.

6. This report was made with measurements estimated from provided photographs, and dimensional drawings. These can be expected to be accurate to approximately 2 to 3 inches (50 – 75 millimeters).

7. The precision of the models used in this report and resulting conclusions was limited because the subject cabinet was not inspected as of the time of this writing. An inspection would afford more accurate dimensional information as well as potentially physical evidence regarding the subject accident.

## Section III
## DISCUSSION

### Event and Environment Background

In his deposition taken on September 11, 2015, Mr. Gaudet indicated that he made contact with the bottom left hand corner of bus 90. His right knee contacted the part above the ground clamp. He indicated that he had grounded the feeder cable and bus and after they had checked everything he had backed out. He stated that he wanted to stick the screwdriver through the loop on the bottom of the ground to tighten it up to try and get past the Gaule (*gall?*) point to ensure a good connection. His left knee was all the way to the ground and the right knee was up. When he bore down on it – that was all he remembered.

Photographs of the cabinets where Mr. Gaudet reportedly was injured showed that each of them was separated into two parts by a cross-bar (**Photograph 1**). The interior of the cabinet had three grounding cables that were each clamped to a bus (**Photograph 2**), attached together and then clamped to the bottom of the cabinet (**Photograph 3**). A set of diagonal wire cutters was found on the ground, under the ground cable. Each of the clamps was attached via a threaded fastener with an eyelet (**Photograph 4**).

Photographs of Mr. Gaudet's clothing were consistent with his statement of electrical entry and exit points in the area of his right knee and left elbow (**Photographs 5 and 6**).

Mr. Pernell Dinvault, who was working with Mr. Gaudet, was questioned in his deposition regarding his knowledge of what Mr. Gaudet intended to do, and he indicated in his statement, that he did not know whether Mr. Gaudet went back into the cabinet to tighten something or to pick something up.

The evidence reviewed, including marks on Mr. Gaudet's clothes, and the medical records, were all consistent with the general understanding that Mr. Gaudet's right knee

came into contact with the electrified lower bus, and his left elbow contacted the interior of the grounded cabinet, in the area with a black mark shown in **Photograph 3**.

**Analysis**

A model approximating the dimensions and components of the cabinet based on the provided photographs and schematic diagrams was created (**Figure 1**).  In order to tighten the grounding cable clamp, a screwdriver would have to be passed through the eyelet and then rotated transversely (as opposed to more common use of a screwdriver in which the screwdriver is in line with the axis of the fastener).   This means that Mr. Gaudet would need to have his hand at approximately the same height as the eyelet in order to pass the screwdriver through it and tighten it.

An anthropometric graphic model male of Mr. Gaudet's height and weight (5 feet 9 inches tall and 190 pounds) was used to analyze postures within the environment of the model cabinet.  It was found that in order to reach with a screwdriver at a level of the ground clamp eyelet all the way to the left from a kneeling position, the length of his forearm would make it such that his torso would have to be mostly within the cabinet, and his head inside of the cross bar (**Figure 2**).  If he were able to reach the area of the eyelet with his right hand, his left elbow would be far above the burn mark on the side of the cabinet.  Therefore, this posture is incompatible with the evidence on the cabinet.  If Mr. Gaudet was kneeling and had his head and torso outside of the cabinet, he would not be able to reach the clamp eyelet with a screwdriver (**Figure 3**), and certainly would not be able to effectively tighten the clamp.  In addition, neither of these positions would place his left elbow in the area of the cabinet with a burn mark, but his left elbow and the area within his clothing with the electrical burn would be well above the area in the cabinet that had evidence of electrical/burn damage.

If he were attempting to tighten the clamp eyelet with a screwdriver, Mr. Gaudet would have the far easier alternative of reaching the eyelet from a standing position; he would be able to reach with his arm between the two cross bars (**Figure 4**).  From a standing,

posture, he would be in a far better biomechanical position to tighten the clamp.  He could easily perform this task from outside the cabinet.

Placing the model's right knee in the area of the bus, and his left elbow near the location of the burn mark on the cabinet, he would be far from being able to reach the area of the eyelet where Mr. Gaudet indicated he was working (**Figure 5**).

If Mr. Gaudet were kneeling on his left knee with his right foot on the ground and his left elbow close to the cabinet, the right knee could come in proximity with the lower bus, and the left elbow would be in proximity to the inside of the cabinet near the location of the burn mark (**Figure 6**).  This posture would be consistent with his reaching towards the bottom of the cabinet, and with the burns on the clothing and on the cabinet and bus.  Given all of the above, this is a more likely posture than that which Mr. Gaudet indicated in his deposition.

All taken together, Mr. Gaudet tightening the clamp from the lower cabinet would require him being nearly entirely inside the cabinet. This would be, from the standpoints of anthropometry and biomechanics, far more difficult than from a standing posture.  His potential posture in reaching towards the bottom of the cabinet is more consistent with the physical evidence on his clothing and the cabinet.

The models used for this analysis were created using estimates of measurements obtained from photographs.  It is anticipated that the location of components is accurate within 2 to 3 inches (50 to 75 millimeters).

The precision of the models created for this analysis, and the opinions and conclusions expressed in this report are limited because the subject was not inspected as of the writing of this report.  An inspection of the cabinet would afford additional and more accurate dimensional information ragardng the cabinet and its components, as well as physical evidence that would provide information regarding the subject accident.

## Section IV
## BASIS OF REPORT

1. The transcripts of the following depositions (and attached exhibits) were reviewed:

   a)  John Shullaw dated October 13, 2015,

   b)  Timothy LeBlanc dated December 21, 2015,

   c)  Pernall Dinvaut dated January 6, 2016,

   d)  Samuel Endres, dated September 22, 2016,

   e)  Jeff Gaudet dated September 11,2015,

   f)  Lee Heine dated December 9, 2015,

   g)  Chet Hough dated September 23, 2015,

   h)  Raymond Kinney dated January 21, 2016,

   i)   Johnny McClinton dated September 22, 2016.

   j)   William Schofield dated February 26, 2016, and

   k)  Floyd Tarver dated January 6, 2016

2. The following legal discovery documents were reviewed:

   a)  Answers to General Electric's Requests for Production

   b)  Answers to General Electric's Requests for Interrogatories

   c)  Answers to Plaintiff's Requests for Production

   d)  Answers to Plaintiff's Requests for Interrogatories

   e)  Circuit Breaker to Valero Request for Production

   f)   Circuit Breaker to Valero Request for Interrogatories

   g)  Gaudet Responses to Circuit Breaker's Request for Production of Documents

   h)  Gaudet Responses to Circuit Breaker Sales Interrogatories

3. CNA Umbrella Policy

4. Circuit Breakers Redacted Policy

5. Circuit Breaker Exhibit 1

6. Valero One Line Diagram Training

7. Valero Cable Testing and Inspection

8. Email containing One Line Diagram Training and Cable Testing and Inspection

9. Documents Bates-Stamped as the following were reviewed:

    a) IEEE 0001-0093,

    b) GE 00001-000103,

    c) CBSC 00001-000371, and

    d) VAL 0001-00447.

10. Powervac Photos (5).

11. One Line Diagram Training documents

12. Expert report of Dr. Michael Morse, with CV and Rule 26 Disclosures

13. Expert Report of Dr. Don Russell, with CV and Rule 26 Disclosures

14. Medical Chronology of for Mr. Gaudet were reviewed.

15. 3D Studio Max was used to create computer models of the biped male representing Mr. Gaudet's dimensions and the subject cabinet.

## Section V
## ATTACHMENTS

A. Photographs

B. Figures

C. CV

## Section V
## ATTACHMENT A

# Photographs

Photographs that form part of our investigation that were not included in this report, were retained in our files and are available to you upon request.

**Photograph 1**
Side view of the cabinet arrangement; the cabinet with both covers removed is the one where Mr. Gaudet's accident occurred (photographed by others)



**Photograph 2**
View of grounding cables and busses (photographed by others).



**Photograph 3**

Common connection and cabinet grounding, along with diagonal cutters found on the ground (photographed by others).



**Photograph 4**

Zoomed in photograph showing threaded clams with eyelets.  Central one is obscured from view by the grounding cable (zoomed in from VAL000392)



**Photograph 5**
Mr. Gaudet's clothing, showing mark on right knee area (photographed by others).



**Photograph 6**
Mr. Gaudet's clothing, showing mark on left elbow area (photographed by others).



Section V
## ATTACHMENT B

# Figures

**Figure 1**
Model of the cabinet approximated from photographs and scale diagrams.



**Figure 2**
Posture necessitated for a male of Mr. Gaudet's height and weight to be able to tighten the left ground clamp from a kneeling position.  Note that the hand's reach is above the level of the top strap.



**Figure 3**
Unless the model is inside the cabinet, he would be unable to reach the area of the ground clamp to effectively tighten the clamp from a kneeling position.  Note that the hand's reach is below the level of the eyelet, which is above the top strap.



**Figure 4**
It would be easier and more biomechanically effective to reach the clamp eyelet from a standing position.



**Figure 5**
Graphic showing that if Mr. Gaudet had his right knee by the lower bus, and his left knee by the cabinet near the area of the mark on the cabinet, he would be far from being able to reach the area where he indicated he was working.



**Figure 6**
A posture of reaching the bottom of the cabinet could be consistent with the burn marks on Mr. Gaudet's clothing and on the cabinet.



Section V

## ATTACHMENT C

# CV



**RIMKUS**
CONSULTING GROUP, INC.

## RICHARD V. BARATTA, Ph.D., P.E.
## SENIOR VICE PRESIDENT

Dr. Baratta is a 1989 graduate in Biomedical Engineering from Tulane University in New Orleans. Dr. Baratta's primary areas of consulting expertise include injury causation biomechanics, accident reconstruction, medical device failures and intellectual property. Dr. Baratta performs biomechanical analysis on cases involving low-speed accidents, driver determination, falling objects, slip and falls, amusement rides, and other accidental events. He has reconstructed accidents involving low-speed accidents, high-speed fatality collisions, pedestrian accidents, vehicle rollovers and other types of accidents. Dr. Baratta also provides expertise in relation to modified, high performance and racing automobiles, and high performance vehicle occupant protection systems and injury analysis. Dr. Baratta is fluent in English and Spanish, and has testified in both depositions and trials in the United States and Mexico.

Dr. Baratta's prior experience has included multiple aspects of orthopedic, facial and spinal biomechanics and rehabilitative engineering and research. He has an extensive publication record addressing basic, applied, and clinical orthopedic topics, and has performed collaborative research with other intramural departments and outside academic and industrial institutions. He has experience in the development, clinical implementation and writing of FDA submissions for a paraplegic ambulation device. Dr. Baratta continues to be involved with teaching biomechanics to orthopedic surgeons seeking recertification.

## EDUCATION AND PROFESSIONAL ASSOCIATIONS

Ph.D. - Biomedical Engineering – Tulane University, 1989
M.S. - Biomedical Engineering - Tulane University, 1986
B.S.E. - Biomedical Engineering and Mathematics, Magna Cum Laude - Tulane University, 1984
Certified Accident Reconstructionist by the Accreditation Commission for Traffic Accident Reconstructionists, ACTAR #1683
Bosch Certified Crash Data Retrieval Technician and Analyst
Registered Professional Engineer, Texas license #100978, Florida #70049, Louisiana #34792, Illinois #062.061946, Alabama #30609-E, New York #087619, Indiana #10911206, Georgia #037772, Oklahoma #26386, Colorado #47906 and Mississippi #20899

Specialized Courses
 Traffic Accident Investigation – Northwestern University Center for Public Safety, 2005
 Traffic Crash Reconstruction – Institute for Police Technology and Management, 2005
 Vehicle and Occupant Kinematics in Rollovers – Society of Automotive Engineers, 2005
 Injuries, Biomechanics and Federal Regulation – Society of Automotive Engineers, 2005
 Vehicle Frontal Crash Occupant Safety and CAE - Society of Automotive Engineers, 2007
 Crash Data Retrieval Technician Course – Bosch, 2008
 Pedestrian and Bicycle Accident Investigation - Institute for Police Technology and Management, 2009
 OSHA Fatal Accidents and Prevention, Red Vector Online University, 2011
 Motorcycle Crash Investigation - Institute for Police Technology and Management, 2011
 Crash Data Retrieval Technician Course – Bosch, 2012
 Electronic Data Recorder Course, 2012
 Advanced Crash Reconstruction Utilizing Human Factors - Northwestern University Center for Public Safety, 2013
 Crash Data Retrieval Data Analyst Course, Collision Safety Institute, 2014

Member: Society of Automotive Engineers
   Association for the Advancement of Automotive Medicine

Honors: Tau Beta Pi, Alpha Eta Mu Beta, Volvo Award on Low Back Pain Research

**RICHARD V. BARATTA, PhD**

## EMPLOYMENT HISTORY

| | |
|---|---|
| 2005 - Present | Rimkus Consulting Group, Inc. |
| 1988 - 2004 | Louisiana State University School of Medicine |
| 1990 - 1997 | Tulane University School of Engineering (Gratis Appointment) |

## DETAILED PROFESSIONAL EXPERIENCE:

## RIMKUS CONSULTING GROUP, INC.                               2005 - PRESENT

Senior Vice President

Provides consulting services to insurance carriers, law firms, and corporate clients. Evaluates and analyzes biomechanical systems, including voluntary and involuntary human motions. Provides human-injury impact analysis in vehicular accidents, amusement park ride accidents, and cases involving falls or falling objects. Performs occupant motion studies to determine injury potential/causation, seatbelt use, the effects of airbag interaction, and determination of occupant positions. Uses both computer and physical models to reconstruct those accidents and to measure the load and injury levels. Evaluates medical device and hospital equipment failures and malfunctions. Provides technical oversight to biomedical engineering and biomechanics division.

## LOUISIANA STATE UNIVERSITY SCHOOL OF MEDICINE            1988 - 2004

Instructor, Assistant, Associate and Full Professor, Orthopedic Surgery
Director of Rehabilitative Engineering

Primary areas of research have included multiple aspects of orthopedic research and rehabilitative engineering. Integrated all aspects of research processes to address basic, applied, and clinical orthopedic topics. Performed collaborative research with other intramural departments and outside academic and industrial institutions. Developed, implemented in the clinical setting and wrote FDA IDE submissions for paraplegic ambulation assistive device. Lectured to medical students, orthopedic surgery residents, and physical therapy students. Trained orthotists, physical therapists and physiatrists on the application and evaluation of paraplegic ambulation programs. Incorporated orthopedic surgeons into the research process from identification of study topics through to publication. Trained residents and students in research methods including experimental design, data collection, analysis, and interpretation. Participated in International Committee writing standards for transcutaneous electrical stimulation devices. Integrated 11 diverse research projects into a center grant, then served as Co-director (de-facto operations manager). Participated in departmental and university-wide committees. Designed, planned and implemented a research rotation for Orthopedic Residents. Developed and executed programs for Biomaterials testing under Good Laboratory Practices Certification requirements.

## TULANE UNIVERSITY SCHOOL OF ENGINEERING                   1990 - 1997

Adjunct Assistant Professor of Biomedical Engineering

Supervised and mentored engineering student through research projects, as part of ongoing and collaborative research. Student projects were at the undergraduate and graduate levels.

## PUBLICATIONS

Author or co-author of 100 scientific journal articles, and over 150 additional publications in various book chapters, proceedings, and transactions, as well as over 140 scientific paper or poster presentations at local, national and international meetings.