**BROOKS JACKSON & LITTLE, INC.**  CONSULTING AND FORENSIC ENGINEERS

2380 O'Neal Lane, Suite F  
Baton Rouge, LA 70816

Telephone (225) 755-3212  
Telefax (225) 755-3233

March 18, 2016

Mr. Lance B. Williams  
Attorney at Law  
McCRANIE, SISTRUNK, ANZELMO,  
    HARDY, McDANIEL & WELCH, L.L.C.  
195 Greenbriar Boulevard  
Suite 200  
Covington, LA 70433

                            RE:    Gaudet vs. Circuit Breaker Sales Co., Inc.  
                                    File No. 160309

Dear Mr. Williams:

     I have investigated the facts and circumstances relating to an accident that occurred on May 17, 2014 resulting in injury to Mr. Jeff Gaudet. Mr. Gaudet was working within the scope of his employment as an electrician in the Valero St. Charles Refinery. He was working inside a section of 13.8 kV switchgear making preparations for testing of a feeder cable that was one of two feeder cables supplying the switchgear. In the process of installing a grounding cable, he made contact with an insulated, energized 7.9 kV copper bus bar resulting in an electrical shock and injury.

**MATERIAL REVIEWED**

     In analyzing the circumstances relating to this incident and in preparing opinions, the undersigned investigator has reviewed the list of information or documents in Appendix A to this report.

**BACKGROUND**

     An accident occurred on May 17, 2014 within the Valero St. Charles Refinery causing injury to one of their refinery electricians, Jeff Gaudet. He was working inside of a 13.8 kV section of electrical switchgear identified as WP2-13.8. This switchgear was a main-tie-main configuration which had two incoming feeders, feeders two bus 1 and bus 2. He was working in



EXHIBIT D

Mr. Williams
March 18, 2016
Page 2 of 17

cubicle 4 which contains the feeder and the circuit breaker supplying bus 2. At the time of the incident, the main circuit breaker for bus 2 was racked out in accordance with a lockout/tagout procedure established by Valero. The incoming circuit breaker supplying bus 1 was closed and the bus tie breaker was closed. This resulted in the section of the No. 2 main bus that was routed through cubicle 4 being energized.

Mr. Gaudet was assisting another Valero electrician, Pernall (Duck) Dinvaut. Mr. Dinvaut was the lead electrician for the work being undertaken. He prepared a job safety analysis (JSA) prior to commencing the work being undertaken on that date. A switching procedure had previously been prepared and the "make ready" switching pursuant to the lockout/tagout procedure had been conducted prior to the date of the accident. The switching procedure was to clear WP2-13.8-2 and is identified as VAL001050. It was signed off by engineering, safety, maintenance and operations. The switching procedure included the provisions that main breaker No. 2 would be opened and that the bus tie breaker would be closed. The No. 2 bus was to remain energized so that power could be supplied to the degasser during the turnaround.

The JSA prepared by Mr. Dinvaut on May 17, 2014 (VAL000024) indicated the equipment to be worked on and the work to be performed. The work to be performed was indicated as: "Test breakers, Test cables, Test XFMR, Clean equipment, Test relays, Test voltage." Under the heading of list test steps (general description), the following was entered: "Test cables, Test bus, Test breakers, Test relays, Test XFMR, Open/Close breakers". Under the preventive measures section of the form, a "check voltage" entry was included. According to both Mr. Dinvaut and Mr. Gaudet, the JSA was reviewed with Mr. Gaudet when he arrived to help Mr. Dinvaut on the morning of May 17. Mr. Gaudet signed off on the JSA at 8:00 a.m.

A work permit was issued to Mr. Dinvaut on May 17, 2014 (VAL000023). It was issued by T.J. Sutherland. The work to be performed included: "Test cables, Test breakers, Test XFMR, Clean equipment, Pull and install breakers, Disconnect and connect XFMR, Test relays, Hook up power from LP-1 and PP-1, Check XFMR fans." Under the checklist section of the work permit, the box was checked that indicated electrical isolation completed. Under the potential hazards section of the work permit, the box was checked that indicated electrical equipment/lines energized. The work scope indicated cold work. The hot work box was not checked.

The work was being done in conjunction with the 2014 West Plant Turnaround. The job task was to perform preventive maintenance on switchgear and transformers in WP-2. The work to be done on the day of the accident was to electrically test the feeder cable from PS-2 to WP-2. The testing of the cable was to be done by contractors. Valero electricians were responsible for the switching and lockout/tagout procedure which included testing and grounding. They were also tasked with checking the torque on the incoming line connection.

The bolted enclosure covers were removed from the back side of cubicles 4T, 4B and 5B after Mr. Gaudet arrived at the WP-2 switchgear on the morning of May 17. Mr. Gaudet proceeded to test for voltage at the terminals of the incoming line feeder to the No. 2 section of the WP-2 switchgear. He was wearing a flash suit and was using a contact type voltage test device. He then installed a ground cluster, which consisted of a single ground cable, which he attached to the grounding bus at the bottom of cubicle section 4B. The grounding cluster contained three additional grounding clamps which Mr. Gaudet affixed to the source side bus pads at the top connection of the No. 2 main circuit breaker. This is the point where the incoming feeder cables were connected to the source side of the circuit breaker. He then took off his flash hood. Mr. Gaudet states he then went back into the cubicle to tighten one of the ground clamps, the one on the C phase, source side of the main circuit breaker. This would have been the terminal to his left. He states that in order to tighten the ground clamp, he was working under one of the cabinet cross pieces and was semi-kneeling with his right knee inside the cubicle and in proximity to the lower bus that was extending through cubicle 4B. This bus went from cubicle 3B, through cubicle 4B and into cubicle 5B. This was the main bus for the No. 2 section of the switchgear. This bus was insulated. The area where Mr. Gaudet was kneeling was a right angle corner which was taped. Mr. Gaudet received an electrical shock through the taped bus.

The switchgear involved in the accident was manufactured by Circuit Breaker Sales Company (CBS). It was originally manufactured for Orion Refining Corporation, the company that owned the refinery prior to Valero. Orion originally prepared specifications for equipment supplied by Siemens Corporation. Orion had specific delivery requirements and space requirements. It appears that Siemens could not meet Orion's criteria. Orion went to CBS and asked for a quote. According to the testimony of William Scofield, President of Circuit Breaker Sales, he negotiated with Orion representatives for what he described as a "hybrid" design for the switchgear based upon the components that he had in his warehouse, new General Electric circuit breakers, and new Siemens relaying. Mr. Scofield stated that the switchgear was not designed to a particular IEEE specification or standard. He further stated that Orion understood what CBS was going to supply and approved the equipment. Orion's lead electrical engineer went to the CBS facility at the final stage of construction and witnessed the switchgear and testing that was performed on the switchgear. The switchgear was furnished without interior barriers. According to Mr. Scofield, Orion was aware of this and raised no issue relating to the design of the switchgear, its components or its component arrangement.

Upon delivery to the Orion Refinery, the switchgear supplied by CBS was assembled on site by an Orion contractor. The switchgear was shipped in sections and the local contractor assembled the switchgear at the Orion facility.

The American Petroleum Institute (API) Recommended practice 540 *Electrical Installations in Petroleum Processing Plants* provides information on electrical installations in petroleum refineries. To maintain safety and operating continuity, requirements for the electrical

Mr. Williams
March 18, 2016
Page 4 of 17

systems in petroleum facilities are more stringent than those for most other manufacturing facilities. It is intended for all individuals and organizations concerned with the safe design, installation and operation of electrical systems in petroleum facilities. This recommended practice addresses specific requirements for those electrical systems.

Section 4 – Facility Power Systems recognizes that using secondary selective electrical supply systems (main-tie-main configuration) within a refinery can provide service continuity when a feeder fault occurs. Under such circumstances, half the load would be temporarily dropped, but service could be restored quickly through manual or automatic operation of the tie breakers.

The standard further states, "The electrical distribution and utilization system must be designed so that it can be inspected and maintained on a regular basis to assure reliable operation. Often the maintenance of electrical facilities for a petroleum facility are maintained at the same maintenance intervals as other process equipment. The connection of unrelated process equipment should be avoided if it cannot be shut down during the primary facility shutdown."

## OSHA CONTROL OF HAZARDOUS ENERGY – LOCKOUT/TAGOUT

Regulation 29CFR 1910.333(b)(2) Lockout and tagging. While any employee is exposed to contact with parts of fixed electric equipment or circuits which have been de-energized, the circuits energizing the parts shall be locked out or tagged or both in accordance with the requirements of this paragraph.

(i) Procedures. The employer shall maintain a written copy of the procedures outlined in paragraph (b)(2).

(ii) Deenergizing equipment.
(A) Safe procedures for deenergizing circuits and equipment shall be determined before circuits or equipment are deenergized.
(B) The circuits and equipment to be worked on shall be disconnected from all electric energy sources. Control circuit devices, such as push buttons, selector switches, and interlocks, may not be used as the sole means for deenergizing circuits or equipment. Interlocks for electric equipment may not be used as a substitute for lockout and tagging procedures.
(C) Stored electric energy which might endanger personnel shall be released. Capacitors shall be discharged and high capacitance elements shall be short-circuited and grounded, if the stored electric energy might endanger personnel.
(D) Stored non-electrical energy in devices that could reenergize electric circuit parts shall be blocked or relieved to the extent that the circuit parts could not be accidentally energized by the device.

 (iii) Application of locks and tags.
  (A) A lock and a tag shall be placed on each disconnecting means used to deenergize circuits and equipment on which work is to be performed, except as provided in paragraphs (b)(2)(iii)(C)and (b)(2)(iii)(E) of this section.
  (B) Each tag shall contain a statement prohibiting unauthorized operation of the disconnecting means and removal of the tag.
  (C) If a lock cannot be applied, or if the employer can demonstrate that tagging procedures will provide a level of safety equivalent to that obtained by the use of a lock, a tag may be used without a lock.
  (D) A tag used without a lock, as permitted by paragraph (b)(2)(iii)(C) of this section, shall be supplemented by at least one additional safety measure that provides a level of safety equivalent to that obtained by the use of a lock.

 (iv) Verification of deenergized condition.
  The requirements of this paragraph shall be met before any circuits or equipment can be considered and worked as deenergized.
  (A) A qualified person shall operate the equipment operating controls or otherwise verify that the equipment cannot be restarted.
  (B) A qualified person shall use test equipment to test the circuit elements and electrical parts of equipment to which employees will be exposed and shall verify that the circuit elements and equipment parts are deenergized. The test shall also determine if any energized condition exists as a result of inadvertently induced voltage or unrelated voltage backfeed even though specific parts of the circuit have been deenergized and presumed to be safe. If the circuit to be tested is over 600 volts, nominal, the test equipment shall be checked for proper operation immediately before and immediately after this test.

## NFPA 70B - 2010 Edition

 The National Fire Protection Association (NFPA) 70B, Recommended Practice for Electrical Equipment Maintenance, is an accepted good practice that provides guidance in establishing electrical maintenance programs for electrical equipment. The standard provides informational tables for maintenance of equipment subject to long intervals between shutdowns. The recommended maximum frequency for testing and maintenance of both medium-voltage, metal-clad and metal-enclosed switchgear is every three-to-six years.

## NFPA 70E - 2004 Edition

 The National Fire Protection Association (NFPA) 70E, Standard for Electrical Safety in the Workplace, is an accepted good practice that provides guidance in establishing rules for workplace safety that are considered good practice in the industry.

Mr. Williams
March 18, 2016
Page 6 of 17

The 2004 Edition of NFPA 70E describes the process of achieving an electrically safe work condition in Article 120 as follows:

Article 120.1 Process of Achieving an Electrically Safe Work Condition. An electrically safe work condition shall be achieved when performed in accordance with the procedures of 120.2 and verified by the following process:
(1) Determine all possible sources of electrical supply to the specific equipment. Check applicable up-to-date drawings, diagrams, and identification tags.
(2) After properly interrupting the load current, open the disconnecting device(s) for each source.
(3) Wherever possible, visually verify that all blades of the disconnecting devices are fully open or that drawout-type circuit breakers are withdrawn to the fully disconnected position.
(4) Apply lockout/tagout devices in accordance with a documented and established policy.
(5) Use an adequately rated voltage detector to test each phase conductor or circuit part to verify they are deenergized. Test each phase conductor or circuit part both phase-to-phase and phase-to-ground. Before and after each test, determine that the voltage detector is operating satisfactorily.
(6) Where the possibility of induced voltages or stored electrical energy exists, ground the phase conductors or circuit parts before touching them. Where it could be reasonably anticipated that the conductors or circuit parts being deenergized could contact other exposed energized conductors or circuit parts, apply ground connecting devices rated for the available fault duty.

Article 120.2(A) states, "All electrical circuit conductors and circuit parts shall be considered energized until the source(s) of energy is (are) removed at which time they shall be considered deenergized. All electrical circuit conductors and circuit parts shall not be considered to be in an electrically safe condition until all sources of energy are removed, the disconnecting means is under lockout/tagout, the absence of voltage is verified by an approved voltage testing device, and, where exposure to energized facilities exists, are temporarily grounded."

Article 120.2(F)(2)(g) states, "Grounding requirements for the circuit shall be established, including whether the grounds shall be installed for the duration of the task or temporarily are established by the procedure. Grounding needs requirements shall be permitted to be covered in other work rules and might not be part of the lockout/tagout procedure."

Mr. Williams
March 18, 2016
Page 7 of 17

Article 120.3 states as follows:

Article 120.3 Temporary Protective Grounding Equipment
(A) Placement. Temporary protective grounds shall be placed at such locations and arranged in such a manner as to prevent each employee from being exposed to hazardous differences in electrical potential.
(B) Capacity. Temporary protective grounds shall be capable of conducting the maximum fault current that could flow at the point of grounding for the time necessary to clear the fault.
(C) Equipment Approval. Temporary protective grounding equipment shall meet the requirements of ASTM F855, *Standard Specification for Temporary Protective Grounds to be Used on De-energized Electric Power Lines and Equipment, 1997.*
(D) Impedance. Temporary protective grounds shall have an impedance low enough to cause immediate operation of protective devices in case of accidental energizing of the electric conductors or circuit parts.

## **CONCLUSIONS AND OPINIONS**

The opinions expressed are based upon review of the material listed in Appendix A; my education in the field of Electrical Engineering and Forensic Engineering; my background and experience in electrical equipment design, specifications and operation; refinery electrical systems; electrical accident reconstruction; the National Electrical Code; and, workplace safety including OSHA regulations and NFPA standards for safety in the workplace. The following opinions are offered to a reasonable degree of engineering probability.

1. Jeff Gaudet was an experienced electrician and would be considered a "qualified" electrician under NFPA 70E, Standard for Electrical Safety in the Workplace, which states that a qualified person is: "One who has skills and knowledge related to the construction and operation of the electrical equipment and installations and has received safety training to recognize and avoid the hazards involved." As a qualified electrician, he received training from his employer, Valero, and worked under the Valero Electrical Safety Standards, a purpose of which was to provide a practical safe working area for employees relative to the hazards arising from the use of electricity. Mr. Gaudet failed to follow the Valero Electrical Safety Standards, safety rules promulgated under OSHA Regulations, and safety rules found in NFPA 70E. His failure to adhere to mandated safety requirements was the direct cause of his accident.

2. Mr. Gaudet violated Valero Electrical Safety Standard 2.2c which states, "Every electrical conductor or circuit part is considered energized until proven otherwise by a qualified person." The back panels to the main-tie-main WP2, 13.8 switchgear cubicles 4T and 4B were removed exposing the electrical equipment on the source side and load side of the incoming line circuit breaker supplying the WP2-13.8-2, 13.8 kV bus. The

Mr. Williams
March 18, 2016
Page 8 of 17

main circuit breaker was racked out. Mr. Gaudet tested the supply side at the incoming terminal lugs which were cable-fed from the top of the switchgear. He found no voltage. He failed to test the bus work that was connected to the load side of the incoming main breaker. The load side bus was energized because the bus tie breaker, which connected the two buses (WP2-13.8-1 and WP2-13.8-2), was closed. Closing the bus tie breaker with one of the two incoming main breakers closed energizes the entire bus in both sections of the switchgear. Had he tested the WP2-13.8-2 main bus, he would have found that it was energized. His failure to test and make this determination was a direct cause of the accident.

3. Mr. Gaudet was working with Valero electrician, Pernall Dinvaut (Duck), in performing a lockout/tagout procedure in preparation for testing the incoming cable P-WP2-13.8-2. According to Mr. Dinvaut, he started the procedure by racking out the main circuit breaker and called for Jeff to assist him. The back panels of cubicles 4T and 4B were removed when Jeff got there. They were removed by a contractor, MMR. According to Duck, when Jeff got there, they went over the job scope and the game plan. He showed him the front of the cabinet where the breaker was racked out and showed him that it was locked out. He showed him the one-line and the permit. Jeff put his lock on the lock box in accordance with the lockout/tagout procedure (see Dinvaut deposition pgs. 24-26). There was a one-line diagram affixed to the front door of compartment 4B. This one-line diagram showed the two incoming main breakers, the bus tie breaker and the relationship of the three breakers to WP2 bus 1 and WP2 bus 2. The electricians were going to work in cubicle 4 of WP2-2. From the one-line, one could readily see that if the bus tie breaker was closed, the main bus in the equipment they were servicing, WP2-13.8-2, would be energized. Immediately adjacent to the cubicle 4 bottom compartment was the operating handle for the bus tie breaker located in cubicle compartment 3B. Above the operating handle were two lights. The red light indicates the breaker is closed. Without knowing anything else, a qualified electrician observing the front of the panel would see that the bus tie breaker was closed because the light would be on. Immediately adjacent to the light indicator was the one-line diagram. Making these simple observations, there is no reasonable way a qualified electrician would not know that the main WP2-13.8-2 bus was energized.

4. Mr. Gaudet actually knew that the bus tie breaker was closed. He opened the cover to the tie breaker and determined that it was closed (Gaudet deposition pg. 56). He knew prior to the accident that the main breaker for feeder 1 was closed and the tie breaker was closed. That meant the entire horizontal bus in the switchgear was energized (Gaudet deposition pgs. 59-60).

5. Additionally, there was a label on the door of cubicle 4B indicating "Tie 4B". There was a second label indicating "WP2-13.8-1 & 2 Bus Tie Aux". These labels both indicated to the observer that the cubicle contained bus tie equipment.

6. Notwithstanding that there was visual indication that the tie breaker was closed, in the planning package was a switching order for the job being conducted by Mr. Gaudet and Dinvaut. The switching procedure clearly indicates in Step 11: "At WP2, close 13.8 kV bus tie breaker, cub 3B" (see Bates VAL001050). Not only was the bus tie breaker closed, it was intentionally closed to allow one of the feeders supplied from the No. 2 bus to remain in service during the turnaround. Both Mr. Gaudet and Mr. Dinvaut said they believed that the equipment in cubicle 4 including top and bottom were de-energized. Since cubicle 4 was located between the tie breaker and the outgoing feeder breaker which was to remain in service (located in cubicle 6B), any experienced electrician should realize that the electricity can't get from cubicle 3 to cubicle 6 without going through cubicle 4.

7. The back covers to the switchgear are barriers to prevent persons from contacting energized electrical components located within the switchgear. Once the covers are removed, the internal parts are exposed and a proper lockout/tagout procedure would dictate that all equipment, which may be accessible to someone working within the cabinet, should be de-energized at the source and locked out or tagged out. All accessible equipment should then be tested to ensure that the lockout procedure is effective. In the case at hand, the lockout procedure was flawed. Once the covers were removed, it should have been obvious to the electrician that there was accessible bus. This bus work was going through the cabinet coming from cubicle 3 and extending into cubicle 5. This bus work was in no way hidden or obscured. Mr. Gaudet was working directly in proximity to the lower bus when he attached one of his ground clamps to the ground bus in the switchgear (see Bates VAL000004). This bus extended to the right into the 5B compartment. It extended up to the load side of the circuit breaker. The vertical section was tapped and was extended through the side wall to cubicle 3 where the bus tie breaker was located. The vertical extension to the load side of the circuit breaker terminated just behind the source side pad where Mr. Gaudet attached a ground lead (see Bates VAL000003). The vertical bus was the connection from the load side of the main circuit breaker to bus No. 2 in the switchgear, the main bus, which is attached to the tie breaker. This was all readily visible, open and obvious. For the electricians to consider this bus de-energized when the switching orders clearly state the bus tie breaker is closed is not in keeping with their training or their responsibilities to work safely and in conformance with mandated safety requirements.

8. As a qualified electrician, Mr. Gaudet was trained to recognize and avoid the electrical hazards that might be present with respect to the equipment upon which he is working. Electrical equipment comes in a wide variety of construction configurations and operating mechanisms. No two pieces of electrical equipment necessarily will be constructed or operated similarly even though they may be doing the same job. Qualified electricians are expected to recognize the hazards that might be present relating to specific job functions and the specific equipment upon which they may be working.

        Electrical equipment supplying power to motors and transformers may have circuit breakers. The equipment may have fuses instead of circuit breakers. The equipment may be drawout or bolted in. The enclosures may be panelboards or switchboards. The equipment may be old or new. The equipment may have been manufactured to a current standard, an older standard or no standard at all. Once the outside panels are removed, or doors are opened, the electrician must use his knowledge and training to recognize the electrical hazards that might be present. In the case at hand, neither Mr. Gaudet nor Mr. Dinvaut used their training and knowledge, or even their common sense. They should have readily recognized that the bus work extending through the lower compartment of cubicle 4 and upward into the upper compartment of cubicle 4 was in fact the main bus for the WP2-13.8-2 section of the switchgear. That is elementary. To then consider that the bus was de-energized without first testing it, and to be working in an energized compartment, was irresponsible.

9.     Mr. Gaudet violated Valero Safe Work Practices, 2.2, f., iv., which states, "All equipment with a nominal voltage rating above 600V shall be de-energized (unless otherwise allowed), verify no voltage present, discharge capacitance using a discharge stick manufactured for that purpose and have safety grounds applied before work within the approach distance can be performed without proper PPE." The main bus was not de-energized and Mr. Gaudet did not verify that there was no voltage present.

10.    Mr. Gaudet violated Valero Electrical Safety Standard 2.3, e., which states, "No qualified person shall take any conductive object closer to energized parts than the limited approach boundary in Table 7 of this document or flash protection zone (whichever is greater), unless:

        i. The qualified person is insulated or guarded from the energized parts, (insulating gloves or insulating sleeves are considered insulating only with regards to the energized parts upon which work is being performed), and no uninsulated part of the body enters the prohibited space as set forth in Table 7."

Table 7 indicates a prohibited approach boundary of 7".

11.    Mr. Guadet violated Valero Electrical Safety Standard 2.4, a., which states, "Electrical equipment and feeders shall be considered energized until tested."

12.    Mr. Gaudet violated Valero Electrical Safety Standard 2.4, b., which states, "All personnel must verify that there are no other energized circuits in the immediate work area."

13. Mr. Gaudet violated Valero Electrical Safety Standard 2.4, d., i., which states, "Determine all possible sources of electrical supply to the specific equipment. Check applicable up-to-date drawings, diagrams and identification tags."

14. Mr. Gaudet violated Valero Electrical Safety Standard 2.4, e., which states, "Apply Lock Out/Tag Out devices in accordance with Valero St. Charles LOTO Policy. (See SHG 4.4.) Each person who could be exposed directly or indirectly to a source of electrical energy shall be involved in LOTO process. In order to be considered de-energized, the following shall apply:

    i. A Qualified Person shall operate controls to verify that the equipment cannot be re-energized.
    iii. All voltage sources, including back-feed or secondary sources, are to be identified, isolated, and confirmed by test to be safe.
    iv. The absence of voltage shall be tested with an instrument rated for the operating voltage."

15. Mr. Gaudet violated Valero Electrical Safety Standard 6.62 which states, "Test Before Touch Process

    a. Electrical equipment should be considered energized until proven otherwise by testing for absence of voltage.
    b. Electricity should always be tested using proper equipment."

16. It was the testimony of Mr. Dinvaut that part of the process of determining the energized state of the electrical equipment to be worked on was to highlight a one-line diagram to illustrate which sections of the switchgear were energized and which sections were de-energized. He stated that he performed this function in another job in the same switchgear that was performed before the date of the accident. That job was done in cubicles 3T and 3B. He had been in cubicle 3B before the accident (Dinvaut deposition pgs. 91-92). On this occasion, he performed lockout and tagout in order that the incoming cable for bus section WP2-13.8-1 could be tested. He states they did the same thing at that time, that is, he tested, grounded and torqued the bolts on the incoming cable. They highlighted a one-line drawing for that work. On that occasion, the tie breaker was open and locked out. In that case, the entire section was dead (Dinvaut deposition pgs. 44-48). At that time, Mr. Dinvaut had the opportunity to see the inside of cubicle 3 and observe that there were no interior barriers present. He remembered it didn't have a middle divider like between the top half and the bottom half of the cubicle. Mr. Dinvaut was aware, prior to the accident on May 17, 2014, that the main bus was exposed inside this switchgear. He knew at that time there were no internal barriers and that precautions needed to be taken to de-energize the entire cubicle before work commenced. He apparently did not apply this knowledge to the work that was being

undertaken in cubicle 4 on the date of the accident. Clearly, he was aware that the tie breaker was closed. He, therefore, should have known that the bus was energized and, from his prior experience, should have known that there were no interior barriers before the back panels were removed. He prepared a job safety analysis, but did not consider that the main bus WP2-13.8-2 would be energized during the work to be conducted. The work permit for the job called for "cold work". The JSA included a provision for testing the bus for voltage. This was not done by Mr. Gaudet. Mr. Dinvaut's failure to assure that proper protective measures were taken, given that the main bus was energized, and his failure to properly instruct Mr. Gaudet that the main bus was energized and that it should be tested, is a contributing cause of the accident.

17. Valero was responsible for providing a safe workplace. They were responsible for training their electricians in understanding how the electrical equipment in a refinery worked. The switchgear, which was being worked on on the day of the accident, was supplied by Circuit Breaker Sales Company. It was acquired by Orion, the company operating the refinery before it was purchased by Valero. The switchgear had no internal barriers between the main bus and the incoming feeder terminals in cubicle 4 where work was being conducted on the date of the accident. The main bus was insulated. There was other switchgear in the Valero plant that was also constructed without internal barriers. It was Valero's responsibility after acquiring the refinery to survey its equipment and understand how it was designed and how it functioned for both operational and maintenance purposes.

18. Valero had the additional opportunity to understand how the WP2 switchgear was designed and constructed during its preventive maintenance on the switchgear. Prudent refinery practice would require that the switchgear be cleaned, tested and checked on a three-to-six year cycle (see NFPA 70B, Recommended Practice for Electrical Equipment Maintenance, Table K.2(d) and (f)). Mr. Tarver testified that the back of the cubicle where Mr. Tarver was working had never been opened (Tarver deposition pg. 63). Prudent and responsible refinery practice would have resulted in Valero opening this cubicle for required maintenance at least twice in the 14 years it had been in service. Valero's lack of knowledge of the configuration of equipment within the enclosure is due to its own failure to properly maintain its equipment in accordance with accepted industry practice. The investigation report prepared by Valero after the 2014 accident stated that preventive maintenance was performed on the WP-2 switchgear in 2010. At that time, the entire bus was not de-energized so that the degassing would remain in operation (see VAL000007-VAL000008). Valero, therefore, failed to adhere to accepted industry standards for preventive maintenance on switchgear and this failure resulted in their claimed lack of knowledge of how the WP-2 switchgear was constructed.

19. The use of main-tie-main substations in a refinery is standard practice. The American Petroleum Institute (API), Recommended Practice 540, states that the main-tie-main configuration provides reliability benefits. It further states that the electrical distribution and utilization system must be designed so that it can be inspected and maintained on a regular basis to assure reliable operation. The standard further states, "The electrical distribution and utilization system must be designed so that it can be inspected and maintained on a regular basis to assure reliable operation. Often the maintenance of electrical facilities for a petroleum facility are maintained at the same maintenance intervals as other process equipment. The connection of unrelated process equipment should be avoided if it cannot be shut down during the primary facility shutdown." Apparently, Valero did not adhere to this API Recommended Practice as they kept the WP2-2 bus energized to keep the degassing process online. If the degassing process was shut down, the bus would have been de-energized and the accident would not have occurred. This was apparently the operational scheme employed when similar work was done on bus WP2-1 and the WP2-13A-1 feeder was taken out of service for testing.

20. Valero operated its electrical substations in the main-tie-main configuration. This is consistent with how virtually all major refineries operate. Valero knew that when they closed the tie breaker both sections of bus would be energized. Valero did not know whether there would be additional barriers inside the switchgear between the incoming line connection points and the main bus. They should have known. They were operating other substations that had the same configuration. There were a series of steps to create a safe working environment wherein the accident would not have occurred. It would have started with Valero's awareness of the fact that the compartment in which Mr. Gaudet was working would be energized as a result of the tie breaker being closed. This fact was not properly communicated to the electricians. The electricians assumed that the entire cabinet was de-energized. This was an improper assumption and would have been remedied by the electricians themselves, in properly reviewing the switching order, viewing the apparatus and the information available to them on site as previously discussed, and ultimately testing before they proceeded with the work. Both electricians stated that if they knew the cubicle was energized they would not have been working in the cubicle.

21. Valero failed to provide the electricians with proper test devices that would enable them to easily determine that the main bus was energized once the back panel was removed. Mr. Gaudet was using a contact type device. Valero Electrical Safety Standard 6.62, b., states that electricity should always be tested using proper equipment. A proximity device should have been utilized to test for the presence of electricity in a cubicle. Valero reportedly has a proximity testing device in their shop. Mr. Gaudet testified that one was available. Valero did not supply each electrician with a proximity testing device. Such devices are very easy to use and would reasonably have put the electricians on notice that the main bus was not de-energized. The failure to provide Mr. Gaudet with a

proximity testing device was a contributing cause of the accident. The failure of Mr. Gaudet to go to the shop, get the proper test device, then use it during this procedure, was a direct cause of the accident.

22. Valero violated OSHA Regulation 29 CFR 1910.333 by not employing a proper lockout/tagout procedure for the job that was being conducted on May 17, 2014.

23. Valero violated NFPA 70E practices by violating Article 120.1 which describes the process of achieving an electrically safe work condition prior to authorizing the work. They further violated Article 120.2 by not requiring all electrical circuit parts be tested for the absence of voltage before allowing electricians to work in the cubicle.

24. Valero appeared to have previous knowledge that there were multiple power sources associated with the WP2-13.8-1 and 2 switchgear. The Valero one-line elevation (VAL000214) has a note to install a nameplate on some of the cubicles stating, "Caution – Multiple Power Sources". These warning nameplates were not installed on the units at the time of the accident.

25. There were no warnings on the switchgear. Typical warnings of hazardous voltage, such as those installed on the switchgear after the accident, do little to inform qualified electricians of the fact that hazardous voltage will be present if proper lockout/tagout procedures are not taken. Qualified electricians know that there is hazardous voltage and they know the precautions to be taken to create a safe working environment.

26. The WP2 switchgear was sold to Orion, the predecessor company to Valero. A specification was originally issued by Orion ostensibly to the Siemens Corporation for purchase of the switchgear. There have been no depositions taken of Orion or Siemens personnel. The only person having knowledge of how the order came to Circuit Breaker Sales (CBS) was from the testimony of William Scofield, the President of Circuit Breaker Sales. He states that the specs originally issued to Siemens were sent to him and considered to be "boilerplate". Orion requested equipment delivery in a time that he understood could not be achieved by the major vendors. There were also space constraints. Orion came to Circuit Breaker Sales to request their quote for equipment that would be workable. Mr. Scofield describes the product produced as a "hybrid". He discussed with Orion what they had, what they didn't have, what they could do and what they couldn't do. He said it may have been a combination of used, reconditioned and new equipment in the assembly. It included GE circuit breakers and Siemens relays. The switchgear did not have internal barriers. Orion agreed to what CBS was doing for them. Orion's Lead Electrical Engineer, Bob Allen, went to the CBS plant and inspected it before it was shipped. The switchgear was built for the particular project and it was unique. He states that the IEEE standards would not apply to this equipment (Scofield deposition pgs. 53-72). According to the Valero 30(B)(6) deposition of Timothy

Leblanc, there wasn't anything wrong with the operation of the switchgear. It was operating appropriately (Leblanc deposition pgs. 192-193).

27. When the switchgear was shipped to Orion from the CBS facility, it was in sections. The Bill of Lading showed five pieces. It was assembled on site by an Orion contractor. The contractor had to make main bus connections as he assembled the switchgear. This was a second opportunity for Orion to be aware of the construction of the switchgear and the fact that it did not have interior barriers. The fact that it was inspected by Orion's lead electrical engineer and that it was viewed again when it was assembled at the refinery is proof that Orion approved the design and construction of the switchgear.

28. Mr. Gaudet contacted the lower main bus in cubicle 4B with his right knee. At the point where he made contact, the bus was insulated by tape. Who installed the tape is unknown. It may have been installed by CBS or during the on-site assembly by the Orion contractor. The reason the tape failed is also unknown. Mr. Gaudet was working adjacent to the bus at the point where the insulation failed and may have damaged the tape while he was attaching his grounding clamp to the ground bus. Valero had never preformed preventive maintenance in cubicle 4. Preventive maintenance should have been performed at least twice prior to the date of the accident and more frequently depending on operating conditions. Part of preventive maintenance is to check for the integrity of the bus insulation. If the tape was deteriorated prior to Mr. Gaudet bringing his knee into contact with the bus, it should have been detected by Valero and repaired (Tarver deposition pg. 63).

29. There was nothing improper about the location of the ground bus. All of the Valero personnel who testified in this matter agreed that a Valero electrician would not have been making an attachment to the ground bus if the main bus was energized. Therefore, there was nothing unsafe in attaching a ground clamp to the ground bus if the cubicle was de-energized on the day the accident occurred.

30. The switchgear involved in this incident does not meet the strict definition of a medium-voltage, metal-clad switchgear. However, it contained safety elements beyond what the standard for medium-voltage, metal-enclosed switchgear requires. It does not fall into a category. It was a hybrid. The equipment meets the requirements of a metal enclosed switchgear assembly. A metal-enclosed switchgear is considered to be safe. The switchgear supplied by CBS to Orion was not unreasonably dangerous in design and could be safely used and maintained.

31. It was reported that there were no attachment points, brackets or holes that indicated that a barrier was previously installed in the original enclosures which were reportedly manufactured by General Electric. Mr. Shullaw, GE representative, testified that he didn't see any holes, perforations, attachment points, brackets or anything of that nature

that would be evidence of where a barrier used to be attached to the metal framing (Shullaw deposition pgs. 52-53). Further inspection may reveal if the cabinets were originally used for metal-enclosed switchgear.

32. Whether or not internal barriers were in place on the switchgear is a condition of the workplace. There are two means of protection for a worker that were incorporated into this switchgear. The first was that all energized components were within metal compartments only accessed by bolted metal doors or covers. Once the rear covers were removed, the energized parts were covered with insulation and with insulating boots. A worker would reasonably have been protected from incidental contact with any energized part within the enclosure, however, it was not recommended nor was it the practice of Valero to allow workers in energized cubicles.

33. The cause of the accident was the failure of Valero and the electricians involved, including Mr. Gaudet, to recognize and incorporate into the job safety analysis the fact that the main bus and the cubicle in which they would be working would be energized. If interior barriers had been installed, depending upon the work function, it may have been necessary for those barriers to be removed and the same circumstance would have been encountered. In a typical preventive maintenance program, all interior components would at least be wiped down and cleaned. If barriers were in place, this would require the removal of the barriers. Because of the proximity of the ground bus to the main bus in cubicle 4B, Mr. Gaudet may have removed any barrier that might have been in place which might have interfered with his making his grounding connection. This is all speculative. What is known is that Mr. Gaudet was working in a space where the main protective barrier, the rear panel, had been removed. He did not ascertain whether there were energized components within the cabinet and it was his job to do so. He did not test and ground all components within the cabinet before working in the cabinet, and it was his job to do so. He placed himself in a position where his right knee made contact with the lower bus. There was no reason for him to be this close to that bus whether it was energized or de-energized for the task he was performing.

I am a practicing electrical and forensic engineer and a licensed professional engineer in the State of Louisiana. I have a B.S. Degree in Electrical Engineering from LSU, 1967. I have been practicing in the profession for over 45 years. I have qualified as an expert in the fields of Electrical Engineering, Forensic Engineering, Electrical and Workplace Safety, Electrical Equipment Failure Analysis, electrical codes and standards, and Electrical Accident Reconstruction in both Federal and State Courts in multiple jurisdictions. A resume and case list are attached in conformance with the Federal reporting rules. Brooks Jackson & Little invoices for my services at the rate of $350.00 per hour.

Mr. Williams
March 18, 2016
Page 17 of 17

      The opinions offered herein are based upon the material reviewed and the investigation performed to date by the undersigned. An inspection of the equipment has been scheduled for a later date which may provide additional information. These opinions are subject to modification or expansion as additional information is analyzed.

Respectfully submitted,

F. M. BROOKS, P. E.

FMB/pbc

Appendix A – Material Reviewed
Appendix B – Resume of F. M. Brooks
Appendix C – Testimony List

# APPENDIX A

# MATERIAL REVIEWED

## Gaudet vs. Circuit Breaker Sales Co., Inc.
## File No. 160309

Circuit Breaker Sales and Repair, Inc.'s Objections and Responses to Requests for Production Propounded by Plaintiffs

Circuit Breaker Sales and Repair, Inc.'s Answers to Interrogatories Propounded by Plaintiffs

Circuit Breaker Sales and Repair, Inc.'s Responses to Requests for Production Propounded by General Electric Co.

Circuit Breaker Sales and Repair, Inc.'s Answers to Interrogatories Propounded by General Electric Co.

Production:    Testing Bates Nos. CBSR000001-CBSR000028
               Invoices and payments Bates Nos. CBSR000059-CBSR000116
               Insurance Certification for Group CBS, Inc.
               Redacted Insurance Policy information

Third Set of Requests for Production of Documents Propounded to Valero Refining by Defendant Circuit Breaker Sales Company

Interrogatories Propounded to Valero Refining by Defendant Circuit Breaker Sales Company

Supplementary Responses to Plaintiffs' First Set of Requests for Production to Circuit Breaker Sales Company

Plaintiffs' Responses to Circuit Breaker Sales Company's Request for Production of Documents

Plaintiffs' Responses to Circuit Breaker Sales Company's Interrogatories

Responses/Answers to General Electric's Interrogatories to Circuit Breakers Sales

CBSC Production:
               Emails Bates Nos. CBSC000001-CBSC000005
               GE Books and Manuals Bates Nos. CBSC000006-CBSC000185
               ISO Work Instructions Bates Nos. CBSC000186-CBSC000194
               Job File Bates Nos. CBSC000195-CBSC000333
               Photos Bates Nos. CBSC000334-CBSC000339
               Powervac Gear Drawings Bates Nos. CBSC000340-CBSC000356
               Siemens and GE pieces Bates Nos. CBSC000357-CBSC000366
               Recorded Statement Bates Nos. CBSC000367-CBSC000371
               CBSC documents Bates Nos. CBSC000372-CBSC000378

GE Production:
               IEEE Standard C37.20.2-1999
               IEEE Standard C37.59-1996
               Powervac Gear Photographs
               Drawings Bates No. GE000101
               John Shullaw Work Experience Bates Nos. GE000102-GE000103
               Insurance Policy Bates Nos. GE00001-GE00079
               Summary of Switchgear Equipment Bates Nos. GE00080-GE00083
               Assembly Instructions Bates Nos. GE00084-GE00100

Valero Production:
    Photographs and Drawings Bates Nos. VAL000001-VAL000060
    Gaudet file Bates Nos. VAL000061-VAL000095
    Gaudet file Bates Nos. VAL000096-VAL000111
    Gaudet file Bates Nos. VAL000112-VAL000202
    Drawings Bates Nos. VAL000203-VAL000215
    Gaudet file Bates Nos. VAL000216-VAL000221
    Gaudet Certificate Bates Nos. VAL000222-VAL000223
    Gaudet file Bates Nos. VAL000224-VAL000245
    Valero Electrical Safety Standard Bates Nos. VAL000246-VAL000293
    Testing Bates Nos. VAL000294-VAL000295
    Testing Bates Nos. VAL000296-VAL000300
    Testing Bates Nos. VAL000301-VAL000304
    Testing Bates Nos. VAL000305-VAL000308
    Photo Bates Nos. VAL000309
    Photos Bates Nos. VAL000310-VAL000334
    Photos Bates Nos. VAL000335-VAL000348
    Photos Bates Nos. VAL000349-VAL000418
    Gaudet file Bates Nos. VAL000419-VAL000447
Valero Basic Training Instructor Guide, Section One-Line Diagram
Valero Preventative Maintenance Standard, Section Cable Testing and Inspection
Report of B. Don Russell with CV and Testimony List
Affidavit of B. Don Russell
Qualifications Brief of Al Winfield
Report of William J. Vigilante, Jr.
Depositions of:    30b6 of GE - John Shullaw w/exhibits
        30b6 of Valero - Timothy Leblanc w/exhibits
        Pernall Dinvaut w/exhibits
        Samuel Endres w/exhibits
        Jeff Gaudet w/exhibits
        Lee Heine w/exhibits
        Chet Hough
        Raymond W. Kinney, Jr. w/exhibits
        Finley Ledbetter
        Johnny A. McClinton
        William Schofield w/exhibits
        Floyd Tarver w/exhibits
        Troy Yosten
NFPA 70B, Recommended Practice for Electrical Equipment Maintenance
NFPA 70E, Standard for Electrical Safety in the Workplace
IEEE Standard C37.20.2-1999, Standard for Metal Clad Switchgear
IEEE Standard C37.59-1996, Standard Requirements for Conversion of Power
    Switchgear Equipment
OSHA Regulations